UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **BANCROFT LIFE & CASUALTY** | § | |
| **ICC, LTD.,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:12-cv-2252** |
| | § | |
| **GRBR VENTURES, L.P.,** | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM AND ORDER

Before the Court is Plaintiff Bancroft Life & Casualty ICC, Ltd.'s ("Bancroft") Motion to Dismiss GRBR Ventures, L.P.'s ("GRBR") Second Amended Counterclaims (Doc. No. 76).[1] The Court is persuaded that GRBR has failed to state a claim upon which relief can be granted in the challenged counterclaims in its Third Amended Answer and Counterclaim and Third-Party Complaint ("Third Amended Answer," or "TAA"; Doc. No. 87-1). Therefore, the Court **GRANTS** Bancroft's Motion.

### I.   BACKGROUND[2]

This case arises from a complex foreign tax advantaged investment scheme between Bancroft and GRBR. GRBR is a family limited partnership organized for George and Beverly Reuter by their corporate and tax attorney and accountant Loren R. Cook. TAA, Section II ¶ 15. According to GRBR, Bancroft, a Saint Lucia-based firm, sold this investment scheme to GRBR

---

[1] GRBR has amended its counterclaims since Bancroft filed this motion to dismiss. *See* TAA. Nevertheless, Bancroft has represented to the Court that it is still pressing its motion to dismiss, now against GRBR's Third Amended Answer.

[2] Unless otherwise noted, all facts are drawn from the allegations in GRBR's Third Amended Answer.

through Mr. Cook and some United States-based Bancroft affiliates. *Id.* ¶ 11. In selling this scheme for Bancroft, at least in GRBR's case, Mr. Cook also worked with several of his own affiliates. GRBR alleges that, while it was Mr. Cook's client, Mr. Cook was also being paid by Bancroft for his services selling the investment scheme. *Id.* ¶ 13.

In November 2005, Mr. Reuter, as principal of GRBR, met with Mr. Cook, who offered GRBR Bancroft's investment scheme. *Id.* ¶ 15. The investment scheme was marketed by Bancroft through Mr. Cook as a "no-risk tax-deferral investment in a captive insurance company – an investment specifically suited for retirees to use to invest the retirement funds they needed to live on immediately and in the near future." *Id.* ¶ 16. The investment scheme was purportedly approved by the Greenberg Traurig law firm. *Id.* ¶ 12. As Mr. Cook explained it, GRBR would purchase Bancroft's Premium Lite Insurance product. Bancroft would deposit the insurance premiums GRBR paid into a reserve account. This arrangement would allow GRBR to deduct the premium payments as business expenses on its tax return. GRBR could then borrow, tax-free, up to seventy-five percent of the premiums paid back for its own use. Meanwhile, Bancroft would hold the remaining reserve balance in the reserve account, and would pay insurance claims from that account. GRBR was to pay interest on the loan amounts, and Bancroft was to deposit that interest into GRBR's reserve account. Bancroft was to return three percent interest on the individual reserves. GRBR would pay an initial six percent fee on the net reserves, and an annual 1.6 % fee on the cash balance in the reserve account. After a five-year investment period elapsed, GRBR could terminate its investment and Bancroft would return GRBR's individual reserve account balance, including the repaid loan principal and interest, and the three percent guaranteed return rate, less any claims, and less any authorized fees. Then, and only then, would

GRBR pay the appropriate deferred taxes. Importantly, "there were no conditions under which the loanback amounts would ever be payable to Bancroft for Bancroft's own use." *Id.* ¶¶ 15-17.

Based on this explanation from Bancroft through Mr. Cook, as well as on Mr. Cook's advice, GRBR decided to make the investment. Around December 2005, GRBR paid $500,000 in Premium Lite insurance premiums. GRBR then immediately borrowed back $350,000 of that premium amount. Around December 2006, GRBR paid $900,000 in Premium Lite insurance premiums and then borrowed back $630,000. GRBR paid additional premiums, as invoiced, in the ensuing years: $5,000 each in December 2007, December 2008, and December 2009. For its insurance premium payments, GRBR received ten different insurance certificates from Bancroft. In total, from December 2005 through December 2010, GRBR invested nearly $1.4 million with Bancroft, borrowed back $980,000, and paid over $200,000 in interest on those loans. Bancroft collected fees throughout this period; GRBR does not know the precise amount Bancroft collected in fees. *Id.* ¶¶ 18-20.

Throughout this period, GRBR monitored its Bancroft reserve account, and came to believe that Bancroft's accounting of it was incorrect, and that Bancroft was mismanaging it. Specifically, GRBR came to believe that Bancroft was deducting improper fees and was not including in its reserve account the interest GRBR paid on the premiums it borrowed back. In April 2008, GRBR requested more information from Mr. Cook on the quarterly statements it was receiving from Bancroft, noting the discrepancies it observed. Nevertheless, on Mr. Cook's own advice, GRBR continued to make regularly invoiced premium payments through November 2010. Mr. Cook argued that GRBR's calculations were correct and that Bancroft's statements were wrong, but said he could resolve the issue. Relying on this advice, GRBR continued to make its payments. However, by December 2010, Bancroft had not corrected its paperwork

concerning GRBR's reserve account balance. At that time, Mr. Cook advised GRBR not to pay its 2010 premium or the 2010 interest on the loans, and GRBR did not make either payment. On or about March 8, 2011, upon Mr. Cook's instructions, GRBR prepared a letter terminating its participation in the investment scheme; that termination letter was delivered to Bancroft on or about March 24, 2011. *Id.* ¶ 22-25.

According to the investment scheme as Mr. Cook had explained it to GRBR, upon termination, "pursuant to the Premium Lite policies, legal ownership of the entire reserve account, ***including the loanback principal and interest***, shifted to GRBR." *Id.* at 27. As GRBR understood it, at that point, Bancroft had no legal right to retain any of GRBR's account, including the loan principal and interest, nor did it have any right to demand payment of the principal "without guaranteed immediate refund of the loanback principal and interest amounts to GRBR." *Id.* Fundamentally, as GRBR understood the operation of the investment scheme, "GRBR's termination letter should have resulted in a 'true-up' of GRBR's reserve account at Bancroft, in which GRBR would pay the December 2010 interest and the loanback principal into GRBR's segregated, protected reserve account; and then Bancroft immediately would pay the final reserve balance to GRBR – including the entire amount of loanback principal and interest." *Id.* According to GRBR's calculations, its reserve account, at that time, should have held the premiums GRBR paid, along with the interest GRBR paid on the loans, and the guaranteed three percent return on the funds in the reserve account, less any claims (GRBR did make a claim in March 2009, which Bancroft paid, *id.* ¶ 21) and relevant fees. Bancroft has refused to act according to GRBR's understanding of their agreement, and, because of this, GRBR continues to withhold the December 2010 premium and interest payment. *Id.* ¶¶ 27, 32.

Bancroft filed this action in July 2012, seeking to collect on the loans it made to GRBR. GRBR answered, asserting several defenses, counterclaims against Bancroft and its affiliates, and third-party claims against Mr. Cook and his affiliates. Bancroft previously filed a motion to dismiss based on the forum selection clause in the insurance program's contract, which requires claims arising under the insurance program to be litigated in St. Lucia. Following extensive briefing and oral argument, this Court found that GRBR had constructive notice of the insurance program's forum selection provision and granted Bancroft's motion. GRBR amended its pleadings following the Court's ruling. The pending motion followed.

## II. LEGAL STANDARD

A court may dismiss a complaint for a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). That is, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d. 868 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "is not akin to a 'probability requirement,'" though it does require more than simply a "sheer possibility" that a defendant has acted unlawfully. Id. Thus, a pleading need not contain detailed factual allegations, but must set forth more than "labels and conclusions, and

a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

Ultimately, the question for the court to decide is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. The court must accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal*, 556 U.S. at 678-79 (citation omitted). The court should not "'strain to find inferences favorable to the plaintiffs'" or "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'" *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)). A court may consider the contents of the pleadings, including attachments thereto, as well as documents attached to the motion, if they are referenced in the plaintiff's complaint and are central to the claims. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). Importantly, the court should not evaluate the merits of the allegation, but must satisfy itself only that the plaintiff has adequately pled a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

Nevertheless, a court may not assume that a plaintiff can prove facts that were not alleged. *Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d 440, 443 (5th Cir. 1986). Indeed, dismissal is appropriate where the complaint "lacks an allegation regarding a required element necessary to obtain relief." *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995) (citation omitted). Even so, "[m]otions to dismiss under Rule 12(b)(6) 'are viewed with disfavor and are rarely granted.'" *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (quoting *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005)).

Finally, the Federal Rules of Civil Procedure provide that a court "should freely give leave [to amend the complaint] when justice so requires." Fed. R. Civ. P. 15(a)(2). "[G]ranting leave to amend is especially appropriate . . . when the trial court has dismissed the complaint for failure to state a claim." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) (citation omitted). A court should generally "afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Id.* Courts must have a "substantial reason" to deny leave to amend, but leave to amend is not automatic. *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (citation omitted). In deciding whether to grant leave to amend, courts may consider many factors, "including undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of the amendment." *Id.* (citing *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981)).

## III. ANALYSIS

Bancroft seeks dismissal of several of GRBR's counterclaims as improperly pleaded, including claims for conversion, fraudulent inducement, fraud, negligent misrepresentation, breach of fiduciary duty, unjust enrichment, both state and federal securities fraud, and violations of the Texas Deceptive Trade Practices Act ("DTPA"). GRBR did not respond directly to Bancroft's arguments, but instead outlined in its response how it satisfied each element of each claim. Should the Court determine that dismissal of any of its counterclaims is warranted, GRBR seeks leave to amend and replead them. The Court addresses each of the challenged counterclaims below.

### A.  Conversion of the Loanback Interest and Principal (Count III(B))

"Conversion is the unauthorized exercise of dominion and control over property inconsistent with or to the exclusion of another's superior rights in that property." *Vickery v. Texas Carpet Co., Inc.*, 792 S.W.2d 759, 763 (Tex.App.—Houston [14th Dist.] 1990, writ denied). Its elements are: "(1) the plaintiff owned or had legal possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; and (3) the plaintiff suffered injury." *Lopez v. Lopez*, 271 S.W.3d 780, 784 (Tex. App.—Waco 2008, no pet.) (citing *United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146, 147-48 (Tex. 1997); *Apple Imports, Inc. v. Koole*, 945 S.W.2d 895, 899 (Tex. App.—Austin 1997, pet. denied)). "If the defendant originally acquired possession of the plaintiff's property legally, the plaintiff must establish that the defendant refused to return the property after the plaintiff demanded its return." *Id.* (citing *Presley v. Cooper*, 284 S.W.2d 138, 141 (Tex. 1955); *Apple Imports*, 945 S.W.2d at 899). Regarding the nature of the injury required, "[a] plaintiff must prove damages before recovery is allowed for conversion." *United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146, 147 (Tex. 1997) (citing *Prewitt v. Branham*, 643 S.W.2d 122, 123 (Tex. 1982)).

An action for conversion of money must meet additional requirements. Such an action will lie "only when it can be identified as a specific chattel, and not where an indebtedness may be discharged by the payment of money generally." *Newsome v. Charter Bank Colonial*, 940 S.W.2d 157, 161 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (citing *Estate of Townes v. Townes*, 867 S.W.2d 414, 419 (Tex.App.—Houston [14th Dist.] 1993, writ denied)). The money must have been "(1) delivered for safe keeping; (2) intended to be kept segregated; (3)

substantially in the form in which it is received or an intact fund; and (4) not the subject of a title claim by its keeper." *Id.*

Bancroft argues for dismissal of GRBR's conversion claim on four grounds: 1) GRBR has not sufficiently alleged that Bancroft "assumed and exercised dominion and control" over the money it lent to GRBR, *Lopez*, 271 S.W.3d at 784, which GRBR has not repaid; 2) GRBR has not alleged that Bancroft refused a demand that Bancroft return the funds to GRBR, which has never repaid them to Bancroft; 3) GRBR has not alleged that it has suffered any damages; and 4) GRBR has not alleged that Bancroft segregated the money at issue in this claim, making it unable to support the requirements of an action for conversion of money.

On its face, GRBR's counterclaim does not state it "owned or had legal possession of the property or entitlement to possession," and this failure to fulfill the elements of the claim is fatal, at least insofar as it relates to the loan interest. *Id.* Rather, as Bancroft argues, GRBR's counterclaim concedes that it does not have legal possession of, or entitlement to, the loan interest *until such a time as it repays the loan principal*:

- "Bancroft . . . to this day, refuses to acknowledge that it must refund the full amount of the loanback principal and interest to GRBR *immediately upon* GRBR's 'repayment' of the loanback principal," TAA Section IV ¶ 42 (emphasis added);

- "Bancroft must return the complete and correct loanback principal and interest *if GRBR 'repays' the loan principal*," *id.* ¶ 43 (emphasis added);

- "GRBR counterclaims against Bancroft for conversion and seeks return of the complete and correct loanback principal and interest *immediately upon GRBR's 'repayment' of the loan principal*," *id.* ¶ 44 (emphasis added).

Thus, GRBR's own counterclaim acknowledges that Bancroft has no obligation to return the loan interest *until* GRBR repays the loan principal. It is undisputed that GRBR has not repaid the loan principal to Bancroft. According to these pleadings, GRBR cannot satisfy the requirement that it have legal ownership of, or entitlement to, the loan interest. Consequently, GRBR has not sufficiently pleaded a claim for conversion of the loan interest. As Bancroft observes, such facts may call out for a declaratory judgment, but they cannot sustain a claim for conversion.

Similarly, with respect to the loan principal, GRBR cannot satisfy the requirement that Bancroft "unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner" for the simple fact that GRBR has not paid the loan principal to Bancroft and still retains it. *Lopez*, 271 S.W.3d at 784. For this reason, GRBR has not sufficiently pleaded a claim for conversion of the loan principal either.

Bancroft's argument that GRBR has not sufficiently alleged that Bancroft refused a demand for the return of the funds at issue is only partly accurate. GRBR claims, and the Court agrees, that it is "undisputed that GRBR demands return of its loanback interest and that Bancroft continues to refuse to return the loanback interest." Resp. in Opposition to Bancroft's Motion to Dismiss GRBR's Loanback-Related Counterclaims at 3 ("GRBR's Response"; Doc. No. 86). As for the loan principal, while GRBR continues to demand that Bancroft return it, as the above quotes from its counterclaim demonstrate, GRBR demands that it is returned only *after* it is repaid to Bancroft. GRBR has not demanded that Bancroft return its loan principal now, and it cannot, on these pleadings, because GRBR is currently in possession of that loan principal – it is, in fact, precisely what Bancroft seeks through this litigation.

GRBR's satisfaction of the damages element faces similar problems. GRBR does plead that it paid "more than $200,000 in interest on the loanbacks." TAA Section II ¶ 19. The Court finds that sufficient to meet the damages requirement for a claim of conversion of the loan interest. In addition to the loan interest, GRBR also claims the loan principal as damages. This, however, is unavailing because GRBR *still possesses* the principal – it claims it as damages only because it is the subject of Bancroft's litigation. *See* GRBR's Resp. at 6-7. This is insufficient to meet the damages element. Moreover, inasmuch as any of the damages GRBR pleads involve Bancroft's management of the reserve account and depend upon the operation of the insurance program's premium return benefit, the Court can only conclude that the claim arises under the insurance program. This is additional cause for dismissal, as the Court has already ruled that claims arising under the insurance program must be brought in St. Lucia.

Finally, Bancroft argues that GRBR has not pleaded sufficiently to meet the added requirements for a claim of conversion of money. First, while GRBR has delivered the loan interest to Bancroft, it has not paid the principal to Bancroft (or the 2010 interest payment), so it cannot be said that GRBR "delivered [those funds] for safe keeping." *Newsome*, 940 S.W.2d at 161. Regarding the second and third elements, GRBR has pleaded that it understood that both the loan principal and interest were to be held segregated in a separate fund. TAA Section II ¶ 15. Finally, Bancroft argues that the funds at issue are the subject of this litigation, defeating any possible satisfaction of the requirement that the money in question is "not the subject of a title claim by its keeper." *Newsome*, 940 S.W.2d at 161. The Court finds Bancroft's argument convincing. While it is true that Bancroft is not the keeper of the funds which it seeks, GRBR is, and GRBR is actively claiming that those funds, and other funds held by Bancroft, rightfully belong to GRBR. In addition, on GRBR's own pleadings, Bancroft too is claiming the funds it

still holds belong to it. Thus, the Court is satisfied that GRBR has not met the additional requirements to state a claim of conversion of money. For the above reasons, GRBR's counterclaim for conversion of the loan interest and principal must be dismissed as insufficiently pleaded.

## B. Fraud, Negligent Misrepresentation, and Fraudulent Inducement (Counts IV(B) and V(B))

In Texas, the elements of fraud are: "(1) a material representation was made; (2) the representation was false; (3) when the representation was made the speaker knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) the speaker made the representation with the intent that it should be acted upon by the party; (5) the party acted in reliance upon the representation; and (6) the party thereby suffered injury." *Eagle Props., Ltd. v. Scharbauer*, 807 S.W.2d 714, 723 (Tex. 1990) (citing *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983); *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex. 1977)). As regards fraudulent inducement, "Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations." *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001). Fraudulent inducement requires a contract; in order to prove it, "the elements of fraud must be established as they relate to an agreement between the parties." *Id.* at 798-99.

The elements of negligent misrepresentation are: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise "reasonable care or competence" in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the

representation. *See McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex. 1999).

Bancroft argues for dismissal of these counterclaims on two grounds: 1) they do not satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), and 2) they do not satisfy the damages element.

Bancroft is largely correct that these fraud-based counterclaims do not satisfy the heightened pleading requirements of Rule 9(b). Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (citation omitted) (internal quotation marks omitted). The Fifth Circuit has explained that "Rule 9(b) requires 'the who, what, when, where, and how' [of the alleged fraud] to be laid out." *Id.* (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997)). Rule 9(b)'s particularity requirement is "supplemental" to the *Iqbal* requirement that a pleading include facts that, taken as true, "state a claim to relief that is plausible on its face." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). Thus, Rule 9(b) "requires only simple, concise, and direct allegations of the circumstances constituting fraud, which . . . must make relief plausible, not merely conceivable, when taken as true." *Id.* at 186 (internal quotation marks omitted).

In its response, GRBR identifies seven misrepresentations which support the fraud, fraudulent inducement, and negligent misrepresentation counterclaims. GRBR's Resp. at 8-9. By and large, these are not pleaded in GRBR's Third Amended Answer, however. The first three

misrepresentations identified by GRBR relate to the recourse or non-recourse nature of the promissory notes, and are nowhere pleaded in connection with the fraud-based counterclaims in the Third Amended Answer, even upon a liberal reading. Bancroft argues that, even if they were properly pleaded, they would be insufficient to support these counterclaims, citing Judge Rosenthal's recent opinion in a separate Bancroft suit, *Bancroft Life & Casualty ICC, Ltd. v. MMXCM Forte Group Ltd., LLP*. *See* No. 4:12-cv-1928 (S.D. Tex. July 16, 2013), Doc. Nos. 20, 38. There, Judge Rosenthal determined that, on their faces, the promissory notes contain patent ambiguities regarding whether they are recourse or non-recourse. The Court is persuaded by Judge Rosenthal's reasoning, and finds that, even if these misrepresentations were pleaded in GRBR's counterclaim, they would be insufficient to sustain the fraud, fraudulent inducement, and negligent misrepresentation counterclaims.

Bancroft also argues that the fourth through seventh misrepresentations are not pleaded in the counterclaims either. The Court agrees that the sixth and seventh misrepresentations, having to do with statements made at a meeting in Mr. Cook's office in November 2007 and subsequent email correspondence between Mr. Cook and GRBR principal George Reuter, are not pleaded in the Third Amended Answer. The Court disagrees that the fourth and fifth misrepresentations are not included in the Third Amended Answer, however. Those have to do with statements Mr. Cook made at a meeting in his office in November 2005. The misrepresentations allegedly made at that meeting are described in sufficient particularity in Section II, paragraph fifteen, and Section IV, paragraphs sixty-two, and sixty-three, of the Third Amended Answer.

Still, Bancroft also argues that these last four misrepresentations, including the two concerning the November 2005 meeting which the Court has determined meet the requirements of Rule 9(b), cannot support the fraud and fraudulent inducement counterclaims because they

rely upon statements made not by Bancroft, but by Mr. Cook, and because they relate to promises of future conduct. Bancroft is correct that the law is clear that "[a] promise to do an act in the future . . . is fraud 'only when made with the intention, design, and purpose of deceiving, and with no intention of performing the act' at the time the promise was made." *Clardy Mfg. Co. v. Marine Midland Bus. Loans, Inc.*, 88 F.3d 347, 360 (5th Cir. 1996) (quoting *Airborne Freight Corp. v. C.R. Lee Enters., Inc.*, 847 S.W.2d 289, 294 (Tex. App.—El Paso 1992, writ denied)). However, GRBR pleads that Mr. Cook was Bancroft's agent and that, as such, Mr. Cook "negligently or intentionally" made the misrepresentations. TAA Section IV ¶¶ 62-63. Accepting the pleaded facts as true, as it must, the Court is satisfied that GRBR has pleaded that Bancroft made the November 2005 statements through its agent Mr. Cook, with the intent not only to deceive, but never to fulfill the promises. *See* TAA Section IV ¶¶ 47-48.

Relatedly, with respect to negligent misrepresentation, Bancroft argues that the fourth through seventh misrepresentations are insufficient because they are grounded in a promise of future action, and "[a] promise to act or not in the future cannot form the basis of a negligent misrepresentation claim." *Roof Sys., Inc. v. Johns Manville Corp.*, 130 S.W.3d 430, 439 (Tex. App.—Houston [14th Dist.] 2004, no pet.). The Court agrees that the law is clear on this point and precludes grounding a claim for negligent misrepresentation in these misrepresentations.

Finally, and perhaps most important, GRBR's fraud, negligent misrepresentation, and fraudulent inducement counterclaims must also be dismissed because they also fail to satisfy the injury requirement. In these counterclaims, GRBR again pleads an injury that it has not yet suffered: the damages that will ensue "[i]f Bancroft prevails in this case in collecting on the loanbacks without returning the premium reserves as promised." TAA Section IV ¶ 62. A potential future injury is insufficient to satisfy the injury element of these counterclaims. Here

too, the damages GRBR pleads involve GRBR's management of the reserve account and depend upon the operation of the insurance program's premium return benefit, leaving the Court to conclude that the damages arise under the insurance program. Again, this is additional cause for dismissal, as the Court has already ruled that claims arising under the insurance program must be brought in St. Lucia. Consequently, GRBR's fraud, negligent misrepresentation, and fraudulent inducement counterclaims must be dismissed.

### C. Breach of Fiduciary Duty (Count VI(B))

In order to make out a breach of fiduciary duty claim, a plaintiff must show "(1) a fiduciary relationship between the plaintiff and the defendant, (2) a breach by the defendant of his fiduciary duty to the plaintiff, and (3) an injury to the plaintiff or benefit to the defendant as a result of the defendant's breach." *Priddy v. Rawson*, 282 S.W.3d 588, 599 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (citing *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied); *Punts v. Wilson*, 137 S.W.3d 889, 891 (Tex. App.—Texarkana 2004, no pet.)). The law creates a fiduciary relationship in certain formal relationships, such as attorney-client and trustee relationships, and will imply them in certain informal relationships based on a relationship of trust and confidence. *Id.* (citing *Lundy*, 260 S.W.3d at 501; *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 698 (Tex. App.—Fort Worth 2006, pet. denied)). "To impose an informal fiduciary duty, the relationship of trust and confidence must exist *prior to, and apart from*, the agreement that is the basis of the suit." *Id.* (citing *Cotten*, 187 S.W.3d at 698) (emphasis added).

16

Bancroft argues for dismissal of this counterclaim on two grounds: 1) no fiduciary relationship existed between GRBR and Bancroft; and 2) GRBR has not satisfied the injury element.

GRBR pleaded that "Bancroft, through its agent Cook, created a special relationship of trust and confidence with GRBR as the entity that was taking the loanbacks with the assurance that they were not commercial loans and that they would never be paid to Bancroft for Bancroft's own use and gain." TAA Section IV ¶ 72. This allegation, however, does not satisfy Texas law, which is clear that, for a court to impute an informal fiduciary relationship such as this, "the relationship of trust and confidence must exist prior to, and apart from, the agreement that is the basis of the suit." *Priddy*, 282 S.W.3d at 599. GRBR has not pleaded that it had a relationship with Bancroft prior to the agreements at the heart of its counterclaim.

Nevertheless, GRBR's Third Amended Answer does allege that Mr. Cook, who, as GRBR's lawyer, unquestionably had a formal fiduciary relationship with GRBR, *see Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988), "violated its fiduciary duties to GRBR by acting as an agent for Bancroft." TAA Section IV ¶ 74. In Texas, third parties who knowingly induce a fiduciary to breach a duty, or who participate in the breach, can be held liable for breach of fiduciary duty as a joint tortfeasor. *See Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 513-14 (Tex. 1942). Consequently, liberally interpreting the counterclaim, because GRBR pleaded that Mr. Cook breached his fiduciary duties to GRBR, and pleaded that Mr. Cook was Bancroft's agent, the Court is satisfied that GRBR has pleaded a claim for breach of fiduciary duty by which Bancroft may be held liable as well.[3]

---

[3] By its third-party claims, GRBR also brings a breach of fiduciary duty claim against Mr. Cook. *See* TAA Section IV ¶¶ 64-77.

The injury element is not as forgiving, however. GRBR pleads that it "has sustained losses because of these breaches of fiduciary duties to it, including the amount of the loan interest and principal and GRBR's attorney's fees and costs in seeking payment of the balance due and in defending against Bancroft's claims for the loanback amounts in this lawsuit, plus interest." TAA Section IV ¶ 76. Again, the Court fails to understand both how GRBR has sustained a loss of the loan principal, when it has not repaid it to Bancroft and in fact has it in its possession, and how it is that GRBR has sustained a loss of the loan interest, when it has pleaded that it is entitled to its return only when the principal is repaid, which has not yet happened. And, again, to the extent that GRBR has sustained a loss of the loan principal and interest, it can only be through Bancroft's alleged mismanagement of the reserve account and because Bancroft has refused to comply with the operation of the insurance program's premium return benefit as GRBR understands it. Such a claim must be, as this Court has already ruled, brought in St. Lucia.

GRBR also argues that it has suffered damages in defending against Bancroft's lawsuit. The extent to which attorney's fees and costs may be sought as damages is a separate issue, but it too is unavailing. In Texas, as is common throughout the United States, attorney's fees and litigation costs are not typically considered damages. *Richardson v. Wells Fargo Bank, N.A.*, 740 F.3d 1035, 1037-38 (5th Cir. 2014) ("Texas courts 'have long distinguished attorney's fees from damages.' . . . Thus, attorney's fees for the prosecution or defense of a claim are not damages under Texas law.") (quoting *In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 172 (Tex. 2013)). This is no less true when the attorney's fees are those of a counterclaimant. *Haden v. David J. Sacks, P.C.*, 332 S.W.3d 503, 521 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("As well-settled law recognizes, however, attorney's fees incurred to *defend* a lawsuit filed by

another are not recoverable.") (citing *Tana Oil & Gas Corp. v. McCall*, 104 S.W.3d 80, 82 (Tex. 2003))). As GRBR has failed to satisfy the injury element, this counterclaim must be dismissed.

### D.  Unjust Enrichment (Count VII(B))

"Unjust enrichment is an equitable principle holding that one who receives benefits unjustly should make restitution for those benefits." *Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App.—San Antonio 2004, pet. denied) (citing *Bransom v. Standard Hardware, Inc.*, 874 S.W.2d 919, 927 (Tex. App.—Fort Worth 1994, writ denied)). "A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) (citing *Pope v. Garrett*, 211 S.W.2d 559, 560, 562 (Tex. 1948); *Austin v. Duval*, 735 S.W.2d 647, 649 (Tex. App.—Austin 1987, writ denied)). Unjust enrichment "is not a proper remedy 'merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss to the claimant, or because the benefits to the person sought to be charged amount to a windfall.'" *Casstevens v. Smith*, 269 S.W.3d 222, 229-30 (Tex. App.—Texarkana 2008, pet. denied) (quoting *City of Corpus Christi v. Heldenfels Bros., Inc.*, 802 S.W.2d 35, 40 (Tex. App.—Corpus Christi 1990), *aff'd*, 832 S.W.2d 39 (Tex. 1992)). Rather, "[t]he profit must be 'unjust' under principles of equity." *Id.* (citing *Zapata Corp. v. Zapata Gulf Marine Corp.*, 986 S.W.2d 785, 788 (Tex. App.—Houston [1st Dist.] 1999, no pet.); *Burlington N. R.R. Co. v. Sw. Elec. Power Co.*, 925 S.W.2d 92, 97 (Tex. App.—Texarkana 1996), *aff'd*, 966 S.W.2d 467 (Tex. 1998)). "The doctrine does not operate to rescue a party from the consequences of a bad bargain." *Burlington Northern R. Co. v. Southwestern Elec. Power Co.*, 925 S.W.2d 92, 97 (Tex. App.—Texarkana 1996), *aff'd*, 966 S.W.2d 467 (Tex. 1998) (citing 42 C.J.S. Implied and Constructive Contracts § 5; *Harris v.*

*Sentry Title Co.*, 715 F.2d 941, 949 (5th Cir. 1983)). Finally, "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory" such as unjust enrichment. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000).

Bancroft argues that this counterclaim too must fail because 1) an explicit contract governed the loans at issue, and 2) the benefit GRBR claims Bancroft to have received has not yet occurred.

As an initial matter, in its Response, GRBR claims that it pleaded unjust enrichment in the alternative, should it be determined that there was no contract governing the loans at issue. While pleading alternative legal theories of liability is certainly acceptable, the Court cannot locate in the Third Amended Answer even the suggestion that, *as a counterclaim*, unjust enrichment was pleaded in the alternative. In fact, only GRBR's defenses are explicitly pleaded in the alternative. TAA at 22. Thus, because GRBR concedes that it executed promissory notes and security agreements governing the loans, *see generally* TAA Section II, it cannot also plead a counterclaim for unjust enrichment based on the loans, unless it does so in the alternative, which it has not. Therefore, the Court has no choice but to dismiss the counterclaim.

Even if it were properly pleaded in the alternative, however, the counterclaim falters. The counterclaim describes Bancroft's unjust enrichment in this way: "Bancroft *will be* unjustly enriched *if* it is allowed to continue to retain GRBR's interest payments and to collect GRBR's loanback principal for its own gain." TAA Section IV ¶ 83 (emphasis added). That is, in this counterclaim, GRBR pleads that Bancroft *will* receive an unjust benefit *at some point in the future*. This is the same damages problem seen in GRBR's other counterclaims: it is not until GRBR pays back the loan principal that it 1) gives up possession of the loan principal, and 2) has

any entitlement to the loan interest. Such future unjust enrichment is insufficient to state a claim upon which relief may be granted; the counterclaim must be dismissed.

And, again, even if Bancroft will be unjustly enriched by retention of the loan principal and interest, that can only be because of Bancroft's alleged mismanagement of the reserve account and because Bancroft has refused to comply with the mechanics of the insurance program's premium return benefit as GRBR understands it. Because such a claim is actually one about the insurance program, it must be, as this Court has already ruled, brought in St. Lucia.

### E.  Securities Fraud (Count X(B))

GRBR brings securities claims pursuant to the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78pp, as well as the Texas Securities Act, Tex. Civ. Stat. Ann. arts. 581-1 to 581-43. Under Section 10(b) of the Securities Exchange Act of 1934,

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission ("SEC")] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). SEC Rule 10b–5, promulgated pursuant to Section 10(b), implements it by prohibiting, among other things, any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). The Supreme Court has determined that Section 10(b) affords a right of action to purchasers or sellers of securities injured by its violation. *Tellabs Inc. v. Makor Issues & Rights, Ltd*, 551 U.S. 308, 318, 127 S. Ct. 2499, 2507, 168 L. Ed. 2d. 179 (2007). To state a claim under Section 10(b), a plaintiff must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation, i.e., a causal connection between the misrepresentation or omission and the loss. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 238-39 (5th Cir. 2009).

> Article 33(A)(2) of the Texas Securities Act provides:
>
> A person who offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security. However, a person is not liable if he sustains the burden of proof that either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

Tex. Civ. Stat. Ann. art. 581-33(A)(2).

Bancroft seeks dismissal arguing that GRBR has not pleaded facts sufficient to demonstrate that the loans at issue constitute "securities" within the meaning of either Section 10(b) or the Texas Securities Act. As defined by both statutes, a "security" can include a "note" such as those underlying the loans in question here. 15 U.S.C. § 78c(a)(10); Tex. Civ. Stat. Ann. art. 581-4(A). Bancroft is correct: whether the notes in question constitute "securities" for the purposes of either federal or state law is a central question.

However, even if GRBR were to have properly alleged that the notes in question constitute "securities" within the meaning of the federal and state securities statutes, the Court is persuaded that, on the facts pleaded, it would still have to dismiss the counterclaim. This is because GRBR pleads that Bancroft's actions in managing the insurance program's reserve account are what converted these notes into securities. *See* TAA, Section IV ¶¶ 108, 110-112. But, the Court can only conclude that, if the counterclaim arises from Bancroft's alleged

mismanagement of the insurance program's reserve account and/or its alleged refusal to pay the premium reserve benefit once the outstanding loans have been paid, the counterclaim arises from the operation of the insurance program. In its pleadings, GRBR itself alleges that any entitlement it has to the "entire reserve account, *including the loanback principal and interest*" originated "pursuant to the Premium Lite policies." TAA Section II, ¶ 27. This Court has already ruled that counterclaims arising under the insurance program must be brought in St. Lucia, according to the program's forum provisions. Accordingly, this counterclaim too must be dismissed.

### F.   Accounting (Count XI(B))

An action for an accounting "is generally founded in equity." *Southwest Livestock & Trucking Co. v. Dooley*, 884 S.W.2d 805, 809 (Tex. App.—San Antonio 1994, writ denied) (citing *Palmetto Lumber Co. v. Gibbs*, 80 S.W.2d 742, 748 (Tex. 1935)). "To be entitled to an accounting, a plaintiff usually must have a contractual or fiduciary relationship with the party from which the plaintiff seeks the accounting." *T.F.W. Mgmt., Inc. v. Westwood Shores Prop. Owners Ass'n*, 79 S.W.3d 712, 717 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (citing *Hunt Oil Co. v. Moore*, 656 S.W.2d 634, 642 (Tex. App.—Tyler 1983, writ ref'd n.r.e.)) "An equitable accounting is proper when the facts and accounts presented are so complex adequate relief may not be obtained at law." *Id.* (citing *Hutchings v. Chevron U.S.A.*, 862 S.W.2d 752, 762 (Tex. App.—El Paso 1993, writ denied). Importantly, "[w]hen a party can obtain adequate relief at law through the use of standard discovery procedures, such as requests for production and interrogatories, a trial court does not err in not ordering an accounting." *Id.* at 717-18 (citing *Hutchings*, 862 S.W.2d at 762).

Bancroft argues that, because no fiduciary relationship exists between it and GRBR, any action for an accounting in this case must be based in the parties' contractual relationship. Citing

*T.F.W. Management*, Bancroft claims that Texas law permits actions for an accounting based in contract only when the contract provides for such an accounting. *See* 79 S.W.3d at 719. Since, Bancroft contends, neither the promissory notes nor the security agreements provides for such an accounting, GRBR's counterclaim does not state a claim for an accounting and must fail.

Bancroft's argument is persuasive. While the Court has determined that GRBR could level a breach of fiduciary duty claim against Bancroft because Texas law will hold liable as a joint tortfeasor a third party who participates in a breach of a fiduciary duty, that determination does not extend Mr. Cook's fiduciary relationship to Bancroft – it extends liability only. Thus, Bancroft is correct that there exists no fiduciary relationship between Bancroft and GRBR, for the reasons outlined above. Therefore, as Bancroft argues, the only basis for an action for accounting is in the parties' contractual relationship. However, the Court finds that Bancroft is correct that the governing promissory notes and security agreements lack an express provision permitting an action for an accounting.

GRBR argues that the structure of the loan program must be read necessarily to require an accounting. The Court is not convinced, though, that this rescues GRBR's claim because it is, at base, a claim for an accounting of the insurance program's reserve account. GRBR is not seeking an accounting according to the terms of the contracts governing the loans at issue – the promissory notes and security agreements. Rather, it is seeking an accounting of the insurance program's reserve account, into which, GRBR alleges, the loan interest was to be paid. Because this Court has already determined that claims arising under the terms of the insurance program must be brought in St. Lucia, pursuant to the insurance program's forum provisions, this claim must be dismissed.

### G.  Texas Deceptive Trade Practices Act (Count XV(B))

The DTPA provides a private right of action to consumers against those who engage in deceptive, misleading, and/or abusive trade practices in violation of the Act. In order to prevail on a DTPA claim, a claimant must first qualify as a "consumer" under the statute, must establish that the defendant violated a specific provision of the Act, and that the violation was a producing cause of the claimant's damages. Tex. Bus. & Com. Code § 17.50(a); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995). The DTPA defines "consumer" as one "who seeks or acquires by purchase or lease, any goods or services." Tex. Bus. & Com. Code § 17.45(4). *See also Sherman Simon Enters., Inc. v. Lorac Serv. Corp.*, 724 S.W.2d 13 (Tex. 1987) (recognizing the two requirements to qualify as a consumer under the DTPA as (1) seeking or acquiring by purchase or lease (2) any goods or services). To qualify as consumers, (1) a party must have sought or acquired goods or services by purchase or lease, and (2) the goods or services purchased or leased must form the basis of the action. *First State Bank of Canadian, Texas v. McMordie*, 861 S.W.2d 284, 285 (Tex. App.—Amarillo 1993, no writ) (citing *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 539 (Tex. 1981)). "'If either requirement is lacking, the person aggrieved by a deceptive act or practice must look to the common law or some other statutory provision for redress.'" *Id.* (quoting *Cameron*, 618 S.W.2d at 539).

If a borrower's primary goal in seeking a loan is to obtain money, that borrower is not a "consumer." *See Knight v. Int'l Harvester Credit Corp.*, 627 S.W.2d 382, 388-89 (Tex. 1982). However, that is not to say that there are not circumstances under which borrowers may be "consumers" under the DTPA: if a borrower's primary objective in seeking a loan is to purchase goods or services, then the borrower may qualify as a "consumer." *See, e.g., Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705, 707-08 (Tex. 1983) (finding that the plaintiffs

were consumers because their ultimate objective in seeking the loan was to buy a house); *Knight*, 627 S.W.2d at 388-89 (finding that the plaintiff was a consumer because his purpose in obtaining an extension of credit was to purchase a dump truck); *Walker v. F.D.I.C.*, 970 F.2d 114, 123 (5th Cir. 1992) (recognizing that Texas law has "undergone considerable departure" from the notion that a loan necessarily lies outside the DTPA).

In addition, if financial services are sought independent of the loan, that is, they amount to something more than services incidental to the loan, they may serve to satisfy the DTPA's "consumer" definition. In *Herndon v. First Nat'l Bank*,    (Tex. App.—Amarillo 1991, writ denied), the borrower sought to acquire from the lender a variety of financial services, including advice on when and where to obtain financing, whether or not to borrow, and how to structure various business financial arrangements. The court held that the lender's financial advice constituted "services" for purposes of the DTPA. *Id.* at 399.

Bancroft argues that GRBR does not qualify as a "consumer" within the meaning of the DTPA because a borrower is not ordinarily a "consumer" for the purposes of the DTPA and GRBR does not plead facts sufficient for it to claim any of the exceptions to that rule.

In its counterclaim, GRBR states that it qualifies as a "consumer" because it "purchased goods or services, *i.e.* loanbacks, from Bancroft through its agent Cook." TAA Section IV, ¶ 140. GRBR's Response expands upon this, stating that in accepting the loans, GRBR bought *investment* and *banking* services from Bancroft. In order for the purchase of such services to qualify GRBR as a "consumer" under the DTPA, they must be *independent* of the loan and not *incidental* to it. *Herndon*, 802 S.W.2d at 398-99. On the facts as GRBR has pleaded them, however, the Court can only conclude that any investment and banking services GRBR bought from Bancroft that were independent of the loan were services relating to the insurance program.

26

Apart from the insurance program, GRBR does not allege that it purchased any investment or banking services from Bancroft. The Court has already ruled that, pursuant to the insurance program's forum provisions, all claims arising under the insurance program must be brought in St. Lucia. Consequently, as, on these facts, even a properly pleaded DTPA claim arises under the insurance program, this claim must be dismissed as well.

## IV. CONCLUSION

For the above reasons, the Court **GRANTS** Bancroft's Motion. Counts III(B), IV(B), V(B), VI(B), VII(B), X(B), XI(B), and XV(B) of GRBR's Third Amended Answer are hereby **DISMISSED**. GRBR may replead its counterclaims, in accordance with both this Memorandum and Order and the Court's previous ruling that all claims relating to the insurance program must be litigated in St. Lucia, within thirty (30) days.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the thirty-first day of March, 2014.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE